### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **In the Matter of an Application to Enforce an** ) | |
| **Administrative Subpoena of the** ) | |
| ) | |
| **COMMODITY FUTURES** ) | |
| **TRADING COMMISSION,** ) | |
| ) | |
| **Applicant,** ) | **Misc. Action No.** |
| ) | |
| **v.** ) | |
| ) | |
| **CODY M. WILSON,** ) | |
| ) | |
| **Respondent.** ) | |
| _____ ) | |

### MEMORANDUM IN SUPPORT OF
### APPLICATION FOR AN ORDER TO SHOW CAUSE AND AN ORDER
### REQUIRING COMPLIANCE WITH ADMINISTRATIVE SUBPOENA

### INTRODUCTION

On November 27, 2018, the Commodity Futures Trading Commission ("Commission" or

"CFTC"), through its Division of Enforcement (the "Division"), issued a subpoena *duces tecum*

and *ad testificandum* (the "Subpoena") to Respondent Cody M. Wilson, an individual residing in

Ammon, Idaho. The Division issued the Subpoena based on information that suggested that Mr.

Wilson may have misappropriated customer funds, or fraudulently solicited customers to pay (1)

for training and trading tips regarding foreign exchange traded currencies ("forex") or (2) for Mr.

Wilson to trade binary options[1] and forex on customers' behalves. Mr. Wilson solicited

---

[1] A binary option is a financial option in which the payoff is either some fixed monetary
amount or nothing at all. *See https://en.wikipedia.org/wiki/Binary_option* (last visited
November 6, 2019). As explained by North American Derivatives Exchange ("Nadex"), a
U.S.-based, retail-focused, online binary options exchange: "A binary option is a financial
instrument based on a simple yes or no question where the payoff is a fixed amount or nothing
at all. . . Each binary option trade starts with a question - will this market be above this price
at this time? If the answer is yes, you can buy the option. If it's no then you can sell the

customers through a variety of ventures, including an entity called Simple Wealth LLC ("Simple Wealth").

In February 2019, Mr. Wilson produced a handful of documents in response to the Subpoena, but he has not responded to a majority of the Subpoena's requests, and his limited response to the other requests appears entirely inadequate.  Indeed, Mr. Wilson admitted he possessed additional responsive documents during a call with Division staff, and the documents that Mr. Wilson produced suggest that there are a significant number of responsive records that have not been produced.  Nonetheless, Mr. Wilson has not produced any additional documents, or provided any justification for his failure to respond adequately to the Subpoena.

After discussions with Mr. Wilson in April 2019 about a mutually convenient time and place for testimony, Division staff scheduled Mr. Wilson's testimony for June 11, 2019.  As an accommodation to Mr. Wilson, Division staff agreed to allow Mr. Wilson to testify at the United States Attorney's Office in Boise, Idaho, rather than the Commission's headquarters in Washington, D.C.  After having some difficulty getting in touch with Mr. Wilson to confirm that he would attend, on April 24, 2019, the Commission served Mr. Wilson with a second subpoena, returnable at the United States Attorney's Office in Boise, Idaho.[2]  Division staff subsequently contacted Mr. Wilson on two occasions to remind him of the upcoming testimony.  Despite

---

option." *See What Are Binary Options?*, NADEX, https://www.nadex.com/products/binary-options/what-are-binary-options (last visited November 6, 2019)*.*  Multiple courts, including one in this District, have held that binary options on commodities are financial instruments regulated by the Commission under the Act.  *See CFTC v. Trade Exchange Network Ltd.*, *et al.*, 117 F.Supp.3d 29, 35-38 (D.D.C. 2015); *see also CFTC v. Atkinson,* No. 18-23992-CIV, 2019 WL 2125026, at *1 (S.D. Fla. Feb. 4, 2019) (rejecting argument that binary options are outside of the Commission's jurisdiction); *CFTC v. Vision Financial Partners, et al.*, 190 F.Supp.3d 1126, 1130 (S.D. Fla. 2016); *CFTC v. Banc de Binary Ltd.*, No. 2:13-cv-00992, 2016 WL 782927, at *7 (D. Nev. Feb. 29, 2016) (binary options were commodity options under the Act).

[2]   The Commission is not seeking enforcement of this second subpoena in the present action.

proper service of both subpoenas, and multiple reminders, Mr. Wilson did not appear for testimony on June 11, 2019, nor did he make any attempt to contact Division staff to postpone or reschedule the testimony.

In sum, Mr. Wilson has failed to comply with the obligations imposed by the Subpoena despite ample notice.  Mr. Wilson has cited no valid reason for his non-compliance, and he stopped communicating with the Division shortly after Division staff scheduled his testimony for June 11, 2019.  Accordingly, the Commission's sole avenue for redress is in this Court, which is a proper venue for this action, possesses subject matter jurisdiction for subpoena enforcement, and personal jurisdiction over Mr. Wilson.  *See infra* at 11-20*, Nat'l Labor Relations Bd. v. Cooper Tire & Rubber Co.*, 438 F.3d 1198 (D.C. Cir. 2006); *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245 (D.C. Cir. 2005); *Fed. Election Comm'n v. Comm. to Elect Lyndon La Rouche*, 613 F.2d 849 (D.C. Cir. 1979); *Fed. Trade Comm'n v. Browning*, 435 F.2d 96 (D.C. Cir. 1970).  The Subpoena is well within the Commission's authority, and the documents and information it demands are sufficiently definite and seek reasonably relevant information.  *See infra* at 20-26.  Therefore, the Court should issue an order requiring Mr. Wilson to show cause why he should not be compelled to comply fully with the Subpoena.  Should Mr. Wilson not show good cause, the Commission respectfully requests that the Court issue a subsequent order:

(1) requiring Mr. Wilson to comply immediately in all respects with the Subpoena, including by:

    (a) producing to the Commission all documents specified in Schedule A to the Subpoena that are in his possession, custody, or control; and

    (b) personally appearing before the Commission at its headquarters in Washington, D.C. to provide testimony; and

(2) granting the Commission any other relief the Court deems appropriate.

## PARTIES AND RELEVANT ENTITIES

Cody M. Wilson is an individual who resides in Ammon, Idaho. *See* Declaration of Commission Investigator Michelle Bougas in Support of Application for an Order to Show Cause and an Order Requiring Compliance with Administrative Subpoena ("Inv. Decl.") at ¶ 5, attached here as Exhibit ("Ex.") 1.

Simple Wealth was an Idaho corporation that was formed in 2016 and dissolved in early 2019. *Id.* Until Simple Wealth's dissolution, Mr. Wilson was a manager and registered agent of Simple Wealth and had the same principal address as Simple Wealth. *Id.* and Ex. A thereto.[3] Mr. Wilson and Simple Wealth are not and have not been registered with the Commission in any capacity. *Id.*

The Commission is an independent federal regulatory agency responsible for administering and enforcing the Commodity Exchange Act, 7 U.S.C. §§ 1–26. (2012) (the "Act" or "CEA"), and Commission Regulations, 17 C.F.R. § 1.1–190.10 (2018) promulgated thereunder ("Regulations"). Inv. Decl. at ¶ 3. The Commission's mission is "to promote the integrity, resilience, and vibrancy of the U.S. derivatives markets through sound regulation." COMMODITY FUTURES TRADING COMMISSION, https://www.cftc.gov/About/Mission/index.htm (last visited November 6, 2019).

The markets within the Commission's jurisdiction affect "a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a) (2012). These markets—with the U.S. futures markets estimated at $30 trillion

---

[3] Simple Wealth's corporate documents list the same address in Meridian, Idaho for both Simple Wealth and Mr. Wilson. As indicated above, the most recent information available to the Division indicates that Mr. Wilson resides in Ammon, Idaho. *Id.* at ¶ 5.

and the swaps markets at $400 trillion as of 2014—are "large and economically significant," and "ensuring that these markets are transparent, open, and competitive is essential to their proper functioning and to help safeguard the financial stability of the Nation."  COMMODITY FUTURES TRADING COMMISSION STRATEGIC PLAN, FYs 2014-2018, at 5, https://www.cftc.gov/ sites/default/files/idc/groups/public/@aboutcftc/documents/file/2018strategicplan.pdf (last visited November 6, 2019).

To achieve its mission, one of the Commission's strategic goals is "comprehensive enforcement," carried out by the Division.  *Id.* at 9, 25-29.  The Division seeks to achieve this goal in part by "employ[ing] various investigative plans, analytics, and tools until sufficient evidence is obtained to determine whether or not a violation occurred within the jurisdiction of the Commission."  *Id.* at 26.  Chief among the Division's tools are requests for information to registrants pursuant to 7 U.S.C. § 6g (2012), voluntary requests for information and interviews of potential witnesses, and the nationwide issuance of subpoenas for documents and compelled testimony pursuant to 7 U.S.C. § 9(5)–(6) (2012).

**THE DIVISION'S INVESTIGATION AND THE SUBPOENA**

In early 2018, the Commission received a complaint concerning Mr. Wilson and Simple Wealth.  Inv. Decl. at ¶ 7.  According to the complaint, Mr. Wilson was using social media to solicit individuals to engage him to provide trading and signals related to trading forex and/or binary options.  *Id.*  Mr. Wilson also purportedly solicited individuals to invest money with Simple Wealth so that he could manage their accounts and trade forex and/or binary options on their behalf.  *Id.*  The complaint indicated that Mr. Wilson may have made misrepresentations to customers or misappropriated customer funds.  *Id.* at ¶ 6.  Accordingly, on behalf of the Commission, the Division initiated an investigation into Mr. Wilson and Simple Wealth from its Washington, D.C. headquarters to discern whether Mr. Wilson, Simple Wealth, and/or other

individuals associated with Simple Wealth had violated, or were violating provisions of the Act and/or Regulations.  *Id*. at ¶ 8.

Division staff have taken several steps in furtherance of the investigation from the Commission's headquarters.  *Id*. at ¶ 12.  Specifically, Division staff in Washington:  received information from individuals regarding Mr. Wilson and Simple Wealth; obtained authority to investigate pursuant to a formal order issued by the Commission; sent out correspondence; requested documents from individuals and entities across the country; received responses and documents in response to those requests; and maintained investigative files.  *Id*. at ¶ 12.

Information obtained by the Commission indicates that Mr. Wilson and his associates may have maintained a number of social media accounts to solicit customers, including Simple Wealth, Simple Wealth Academy, Team Unemployable, Young Millionaires, Onthehouse, and Marque (or Marquee) Media (collectively, the "Cody Wilson Entities").  *Id*. at ¶ 9.  Mr. Wilson and the Cody Wilson Entities offered products and services that went by a variety of names, including Simple Wallet, Simple Wealth Auto Trading, Greener Pastures, and the Simple Wealth Signal Group.  *Id.*

According to complaints received by the Commission, prospective customers were told that investing with Mr. Wilson or the Cody Wilson Entities would yield a significant payout in a short period time.  The investigative team obtained information suggesting that in one instance, Mr. Wilson made representations to customers that he could generate a return of more than 300% within four months.  *Id.* at ¶ 10.  In another instance, Simple Wealth marketing materials promised a guaranteed return on investment that was set in tiers based on the amount of money a customer invested, with the highest tier purportedly yielding a 50% return on investment every month.  *Id*.  In many instances, individuals that Mr. Wilson solicited sent funds directly to him.

6

*Id*. at ¶ 11.  Individuals sent funds to Mr. Wilson at personal and company bank accounts at Wells Fargo Bank, and also through service providers such as PayPal and Square.  *Id.*

Certain individuals told Division staff that they were unable to make withdrawals from their accounts with Mr. Wilson and Simple Wealth upon request.  *Id*.  The investigative team obtained information suggesting that at some point in 2018, Mr. Wilson told customers that his trading accounts had been hacked, that all of the investors' money had been stolen, and that neither he nor Simple Wealth would be able to return the individuals' original investment or pay the returns the individuals had been promised.  *Id*.  Another customer reported that Mr. Wilson unfriended and/or blocked him on Facebook after the alleged hacking of Mr. Wilson's trading accounts.  *Id*.  Division staff has been unable to determine if Wilson had any trading accounts for funds invested by Simple Wealth customers, and if so, whether those accounts were hacked, as Mr. Wilson claimed.  *Id.*

Based on the information that Division staff gathered, it was clear that Mr. Wilson possessed vital and direct information concerning the investigation.  Acting pursuant to a formal order of investigation, the Division issued the Subpoena on November 27, 2018.[4]  *Id.* at ¶ 13 and Ex. B thereto.  After some initial difficulty tracking Mr. Wilson down, the Subpoena was served on Mr. Wilson on December 10, 2018, by hand delivery to his spouse at their residence in Ammon, Idaho.  *Id*. at ¶ 13 and Ex. C thereto.

The Subpoena requires Mr. Wilson to produce documents from September 1, 2014, through the present that relate to himself, Simple Wealth, and other entities that may be relevant

---

[4]   The Commission also issued a Subpoena to Simple Wealth, LLC on November 27, 2018, but it is not seeking to enforce that subpoena in this action.

to potential violations of the Act or Regulations.[5]  The request includes:  documents concerning

Mr. Wilson's communications with customers and potential customers; documents concerning

advertising and promotional materials; documents concerning websites and social media

accounts for Simple Wealth and the Cody Wilson Entities; documents concerning bank accounts

relating to Mr. Wilson; documents pertaining to trading accounts for forex, futures, and options

on futures; and documents concerning Mr. Wilson's own investments and accounts relating to

the entities at issue.  *Id.* at ¶ 14 and Ex. B thereto at 5-7.

The Subpoena required Mr. Wilson to produce responsive documents by December 21,

2018, and commanded Mr. Wilson to appear to testify before officers of the Commission on

January 8, 2019 at the Commission's headquarters in Washington, D.C.  *Id.* at ¶ 15 and

Ex. B thereto.  The front of the Subpoena contained a warning in bold-faced capital letters that

"failure to comply with this subpoena may result in the commencement of a legal action in the

United States District Court to compel compliance with the requirements hereof."  *Id.*

On December 19, 2018, Mr. Wilson emailed Division staff and confirmed that he had

received the Subpoena.  *Id.* at ¶ 16 and Ex. D thereto.  In a telephone conversation on December

20, 2018 that was subsequently memorialized in an email, Mr. Wilson requested, and Division

staff granted, an extension of his time to respond to the subpoena *duces tecum* until January 11,

2019; Division staff also agreed to adjourn the appearance date for Mr. Wilson's testimony until

a future date.  *Id.* at ¶ 16 and Ex. E thereto.  During this phone call, Wilson again acknowledged

that he had received the Subpoena.  *Id.*

On or around February 1, 2019, Mr. Wilson made what has been his only production of

documents to date, which consisted of 18 pages of documents.  This production contained some

---

[5]  Based on information available to the Division, the Division discerned that Mr. Wilson may
have used these other companies in schemes similar to Simple Wealth.

responsive documents, but did not respond to the vast majority of the requests in the Subpoena: Mr. Wilson has not produced any bank account records, customer account statements, or trading records, and his production of communications with customers was limited to self-serving disclosures and waivers that were sent to and acknowledged by four customers.  *Id.* at ¶ 17.  The documents that Mr. Wilson *did* produce, and documents that the Division has obtained from other sources, suggest that Mr. Wilson likely possesses responsive records that he has not produced.  *Id.* at ¶ 18.  For example, Division staff has obtained Facebook communications between Mr. Wilson and third parties, but Mr. Wilson has not produced corresponding copies of those communications, despite the fact that he was able to produce disclosures and waivers from Facebook.  *Id.*  Likewise, documents obtained by Division staff indicate that Mr. Wilson maintained bank accounts where he received deposits for Simple Wealth, but Mr. Wilson has not produced any of those bank records—or any bank records at all.  *Id.*  Finally, publicly-available documents from the Idaho Secretary of State confirm that Mr. Wilson incorporated Simple Wealth and served as its registered agent, but Mr. Wilson has not produced any records regarding Simple Wealth except for the first page from an amendment to the certificate of organization and a "purchase receipt" for filing an amendment to the organization.  *Id.*

On April 8, 2019, Division staff called Mr. Wilson to discuss the apparent insufficiency of his document production and to schedule his testimony.  *Id.* at ¶ 19.  Mr. Wilson told Division staff that he had not destroyed any responsive materials, but nonetheless insisted that the 18 documents he produced were the only responsive documents he could locate or produce.  *Id.* Mr. Wilson confirmed that he used Facebook to market Simple Wealth, but claimed that he did not know how to produce documents from Facebook to Division staff.  *Id.*  However, Mr. Wilson's February 2019 production included screenshots of what appear to be communications

from Facebook.  Division staff nonetheless offered to provide, and subsequently did provide, information to Mr. Wilson about how to collect and produce documents from Facebook. *Id.* at ¶ 19 and Ex. F thereto.  Division staff also reiterated Mr. Wilson's obligation to produce all responsive documents within his possession, custody, or control.  *Id.* at ¶ 19.

During the call, Mr. Wilson mentioned that he had a personal trip planned for early May and asked if his testimony could be scheduled some time after May 15, 2019.  *Id.* at ¶ 20. Division staff indicated a willingness to accommodate this request and told Mr. Wilson that they would be back in touch with a proposed date.  *Id.*  Mr. Wilson confirmed that he still resided at the location where the Subpoena had been served, and also confirmed that he could be reached at the email address that Division staff had on file.  *Id.*

On April 9, 2019, Division staff emailed Mr. Wilson at that email address, indicating that the Division would like to take Mr. Wilson's testimony during the week of June 10, 2019, and asking if he had any preference for days during that week.  *Id.* at ¶ 21 and Ex. F thereto.  After waiting more than two weeks for a reply, on April 24, 2019, the Commission issued a second subpoena, which commanded Mr. Wilson to appear for testimony on June 11, 2019 at the United States Attorney's Office in Boise, Idaho.  *Id.* at ¶ 22 and Ex. G thereto.  Like the original Subpoena, the front of the second subpoena contained a warning in bold-faced capital letters that "failure to comply with this subpoena may result in the commencement of a legal action in the United States District Court to compel compliance with the requirements hereof."  *Id.* at ¶ 22 and Ex. G thereto at 1.  The second subpoena was served on Mr. Wilson via email on April 24, 2019, and sent to Mr. Wilson by UPS delivery on April 25, 2019.[6]  *Id.* at ¶ 22 and Ex. H thereto; *see also id.* at ¶ 22 and Ex. G thereto.  On or around May 15, 2019, the Commission received the

---

[6]   Division staff sent the second subpoena to the physical address and email address that Mr. Wilson confirmed were accurate during the call on April 8, 2019.  *Id.* at ¶ 22.

second subpoena from UPS with a label indicating that the receiver—Mr. Wilson—refused

delivery.  *Id.* at ¶ 23 and Ex. I thereto.  Division staff emailed Mr. Wilson on May 16, 2019,

reattaching the second subpoena, reminding Mr. Wilson of his obligation to appear, and

indicating that there could be legal consequences for his failure to appear, including the

commencement of an action in federal court to compel compliance.  *Id.* at ¶ 24 and Ex. J.  On

May 17, 2019, Division staff sent a text message to Mr. Wilson reminding him that his testimony

was scheduled for June 11, 2019.  *Id.* at ¶ 24.

On June 11, 2019, Division staff appeared at the United States Attorney's Office in

Boise, Idaho to take Mr. Wilson's testimony.  *Id.* at ¶ 25 and Ex. K thereto.  Mr. Wilson did not

appear for the testimony or make any attempt to contact Division staff.  *Id.* at ¶ 25 and

Ex. K thereto at 5.  Division staff went on the record in Mr. Wilson's absence, noting

Mr. Wilson's non-attendance and introducing the two subpoenas and certain correspondence as

exhibits.  *Id.* at ¶ 25 and Ex. K thereto at 5-9.  In the subsequent months, Mr. Wilson has not

contacted Division staff to explain his nonattendance or attempt to reschedule his testimony.

*Id.* at ¶ 25.  Indeed, Mr. Wilson has not contacted Division staff at all since the phone call on

April 8, 2019.  *Id.* at ¶ 26.

### THE COURT HAS JURISDICTION AND
### IS A PROPER VENUE FOR THIS APPLICATION

The Act permits expansive service and enforcement of administrative subpoenas.  It

grants the Commission nationwide and global authority to "administer oaths and affirmations,

subpoena witnesses, compel their attendance, take evidence, and require the production of any

books, papers, correspondence, memoranda, or other records that the Commission deems

relevant or material to the inquiry."  7 U.S.C. § 9(5); *see also id.* § 9(6) ("The attendance of

witnesses and the production of any such records may be required from any place in the United

States, any State, or any foreign country or jurisdiction at any designated place of hearing.").

The Commission's authority to enforce its subpoenas is equally expansive:

> In case of contumacy by, or refusal to obey a subpoena issued to, any person, *the Commission may invoke the aid of any court of the United States within the jurisdiction in which the investigation or proceeding is conducted*, or where such person resides or transacts business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records.  Such court may issue an order requiring such person to appear before the Commission or . . . other officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question.

7 U.S.C. § 9(8) (emphasis added).  As explained below, because Section 9(8) "both establishes

where venue and personal jurisdiction are proper and serves as a specific grant of subject matter

jurisdiction," this Court has jurisdiction to enforce the Subpoena, and is a proper venue for doing

so.  *See* Memorandum and Order, *In re CFTC* v. *Sullivan,* No. 15-mc-00032, Dkt. No. 8, at 2

(D.D.C. April 3, 2015) (Moss, J.), a copy of which is attached here as Ex. 2.

## I.      THE COURT HAS SUBJECT MATTER JURISDICTION

### A.      Legal Background

In a series of opinions, the D.C. Circuit has provided guidance for interpreting the

language in Section 9(8) of the Act that permits the Commission to enforce investigative

subpoenas in "the jurisdiction in which the investigation or proceeding is conducted."  *See, e.g.*,

*Fed. Election Comm'n v. Comm. to Elect Lyndon La Rouche*, 613 F.2d 849 (D.C. Cir. 1979);

*U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245 (D.C. Cir. 2005); and *Nat'l Labor

Relations Bd. v. Cooper Tire & Rubber Co.*, 438 F.3d 1198 (D.C. Cir. 2006).[7]

---

[7]    Although the statutory language at issue in *La Rouche*, *ASAT*, and *Cooper Tire* is not identical to that in Section 9(8), multiple courts in this district have concluded that the reasoning of those cases applies to Section 9(8).  *See* Ex. 2, *Sullivan,* No. 15-mc-00032, Dkt. No. 8, at 2 n.1 (Moss, J.) ("Although the Court of Appeals' precedents regarding the proper location for

In *La Rouche*, the circuit considered whether the District of Columbia District Court had subject matter jurisdiction to enforce subpoenas issued by the Federal Election Commission to five organizations at their New York offices.  *La Rouche*, 613 F.2d at 851-52.  Relying on an earlier court of appeals decision, *Fed. Trade Comm'n v. Browning*, 435 F.2d 96 (D.C. Cir. 1970), and various district court cases interpreting comparable provisions of the Federal Trade Commission Act, the *La Rouche* court set forth a two-part inquiry, holding that in evaluating jurisdiction over an investigatory subpoena enforcement action, a court must consider:

> (1) "whether the District of Columbia bore a sufficiently 'reasonable relation to the subject matter of the investigation' to qualify as a place where the inquiry was carried on, and
>
> (2) whether the agency's choice of this jurisdiction as its place of inquiry exceeded 'the bound of reasonableness.'"

*Id.* at 856-57 (citation omitted).  *See also ASAT*, 411 F.3d at 248 (citing the *La Rouche* test with approval); *Cooper Tire & Rubber Co.*, 438 F.3d at 1201 (same).

In *ASAT*, the D.C. Circuit considered a subpoena issued by the United States International Trade Commission.  In concluding that the district court had jurisdiction and was a proper venue for a subpoena enforcement action, the court delineated a number of factors to be considered under *La Rouche*'s "reasonable relation" prong, including:

> The place where the Commission held its hearing, the place where it made the decision to authorize the investigation, the place where the subpoenas were issued, the place where its correspondence emanated, the place where the Commission determined that unlawful actions had occurred, the location of the documents and witnesses, and the location of the headquarters of the subpoenaed company.

*ASAT*, 411 F.3d at 249.

---

enforcement of agency subpoenas involve different statutes, those statutes are similar to 7 U.S.C. § 9(8), and there is no reason why the logic of those decisions should not control here."); Order, *In re CFTC v. Conley*, No. 16-mc-02158, Dkt. No. 9, at 2-3 (D.D.C. February 6, 2017) (Sullivan, J.), a copy of which is attached here as Ex. 3 (citing *ASAT*).

Finally, *Cooper Tire* involved a National Labor Relations Board ("NLRB") investigation into activities at a Tupelo, Mississippi manufacturing plant.  *Cooper Tire*, 438 F.3d at 1198-99. The court held that jurisdiction did not exist because the NLRB's investigation concerned a single manufacturing plant in a single location outside of the District of Columbia.  Importantly, the *Cooper Tire* court explained that it did not intend to disturb precedent that subpoenas could be enforced even though the subject of the investigation was located outside of the District of Columbia.  The court commented that:

> [E]very one of these cases involved an investigation that encompassed multiple jurisdictions and could be characterized as nationwide in scope. ***When an investigation is nationwide in scope, its subject matter is not located in any particular place, and the location of the investigating office may well be the most reasonable choice for purposes of subpoena enforcement.***

*Id.* at 1202 (emphasis added);[8] *see also* Ex. 3, *Conley,* No. 16-mc-02158, Dkt. No. 9 at 4 ("when an agency is conducting a nationwide investigation and the District of Columbia is the 'hub' of that investigation, a District Court in the District of Columbia has subject matter jurisdiction and venue is proper in that court").  The *Cooper Tire* court ultimately clarified that jurisdiction "do[es] not . . . always require[] a national investigation; enforcement in the District, as anywhere else, depends on an application of the factors listed in *La Rouche* and *ASAT*, and a national investigation merely works to tip the scale in favor of the District."  *Id.* at 1204.

*          *          *

---

[8]  For example, the court explained that the subpoena in *La Rouche* flowed from an investigation into possible improprieties of a national political party in a national political campaign, involving donations from multiple states.  *Id.*  Even though many of the activities under investigation occurred in New York, it reasoned, the investigation was nationwide in scope, and so the District of Columbia had jurisdiction over subpoena enforcement as the hub of that investigation.  *Id.* at 1202-03.

Because this action satisfies both prongs of the *La Rouche* test as interpreted by *ASAT* and *Cooper Tire*, this Court has jurisdiction to enforce the Subpoena.

### B.     The District of Columbia Is Reasonably Related to the Commission's Nationwide Investigation

The Division is conducting a nationwide investigation into Mr. Wilson and Simple Wealth.  Inv. Decl. at ¶¶ 8-12.  Division staff issued requests to Commission registrants across the country for documents relating to any trading accounts in the name of Mr. Wilson or Simple Wealth.  *Id.* at ¶ 12.  Division staff also issued subpoenas to financial institutions located in California, Idaho, and Washington, D.C, and records from those institutions indicate that over the period March 2015 to February 2018, Mr. Wilson and/or Simple Wealth received money from customers across the United States, including California, Florida, Georgia, Idaho, Illinois, Indiana, Minnesota, Mississippi, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, and Virginia.  *Id.*  Division staff have contacted or attempted to contact Simple Wealth investors or customers that appear to reside outside of Idaho.  *Id.*

The District of Columbia is the hub of this investigation.  As in *ASAT*, "the Commission's activities" regarding the Subpoena "were conducted overwhelmingly in the District of Columbia."  *ASAT*, 411 F.3d at 249.  The attorneys and staff conducting the investigation are located in the District of Columbia, as are the investigative files.  Inv. Decl. at ¶ 12.  The formal order of investigation, the Subpoena, and related correspondence emanated from Commission headquarters in the District of Columbia.  *Id.* at ¶¶ 12-13.  Finally, the Subpoena was returnable in the District of Columbia, and Wilson himself produced documents to Division staff located in the District of Columbia.  *Id.* at ¶¶ 14, 17.  In other words, "[b]ecause . . . the Commission conducted the administrative activities essential to the investigation in the District

of Columbia, the district court here ha[s] subject matter jurisdiction" under the Act. *ASAT*, 411

F.3d at 249 (citations omitted).

*Cooper Tire*—which appears to be the sole instance of a District of Columbia court

denying jurisdiction in an agency subpoena enforcement action—is readily distinguishable. The

NLRB's inquiry in *Cooper Tire* focused on localized labor-related activities occurring at a single

manufacturing plant in Tupelo, Mississippi. *Cooper Tire*, 438 F.3d at 1198-99. Moreover,

*Cooper Tire* stemmed from alleged violations of an existing cease-and-desist order previously

issued by a court in another jurisdiction, namely the Fifth Circuit. *Id.* at 1202. Facing these

facts, the court found that the NLRB's mandate was no broader than the particularized events at

issue. *Id.* at 1204.

Here, by contrast, the Division's investigation concerns services offered through social

media accounts with no geographic restriction, solicitations sent to individuals located across the

country, and potentially fraudulent activity in connection with money transferred to Mr. Wilson

from more than fifteen different states. Inv. Decl. at ¶¶ 7-12. The CFTC's mandate is to protect

the integrity of global derivatives markets. COMMODITY FUTURES TRADING COMMISSION,

https://www.cftc.gov/About/MissionResponsibilities/index.htm (last visited November 6, 2019).

Any activity in these markets, including Mr. Wilson's potentially fraudulent activity, necessarily

affects market participants, like the investors described here, located across the United States.

The Commission is unaware of any case in the District of Columbia in which a court

relied upon *Cooper Tire* to hold that it did not have jurisdiction to enforce an agency subpoena;

to the contrary, courts have continued to enforce such subpoenas in the thirteen years since

*Cooper Tire*. *See, e.g.*, *CFTC v. Ekasala*, 62 F. Supp. 3d 88, 92 (D.D.C. 2014) (enforcing a

CFTC subpoena issued to a Florida-based owner of a Florida company); *CFTC v. McGraw Hill*

*Cos., Inc.*, 507 F. Supp. 2d 45 (D.D.C. 2007) (enforcing, in part, a CFTC subpoena issued to a New York-based corporation); Ex 2, *Sullivan,* No. 15-mc-00032, Dkt. No. 8, at 2 (enforcing a CFTC subpoena issued to a California-based owner and California company); Ex. 3, *Conley,* No. 16-mc-02158, Dkt. No. 9, at 4 (enforcing a CFTC subpoena issued to a Florida-based resident); *In re CFTC v. Butler*, No. 18-mc-136, Dkt. No. 7, at 2 (D.D.C. Apr. 24, 2019) (enforcing a CFTC subpoena issued to an Alabama- and Florida-based individual).[9]  This is not surprising, as "administrative activities [pertaining to agency subpoenas] may occur in the District of Columbia in most, if not all, Commission inquiries and therefore the district court for the District of Columbia often, if not always, would have subject matter jurisdiction." *ASAT*, 411 F.3d at 250.

*Conley* is particularly instructive.  There, the court noted that the respondent and any responsive documents he possessed were based in Florida, and pointed out that, unlike *La Rouche*, the entity under investigation was not a "national political party or national political campaign." Ex. 3, *Conley,* No. 16-mc-02158, Dkt. No. 9, at 5.  The court nonetheless enforced the subpoena based on the nationwide scope of the investigation, concluding that "even if the scope of the Commission's investigation is more localized than [*La Rouche*], it is still fairly characterized as 'nationwide' with a hub in the District of Columbia." *Id.*at 6.  In reaching that

---

[9]   *See also F.T.C. v. Church & Dwight Co.*, 747 F. Supp. 2d 3 (D.D.C. 2010) (enforcing administrative subpoena against Canadian subsidiary), aff'd, 665 F.3d 1312 (D.C. Cir. 2011); *FTC v. Boehringer Ingelheim Pharm., Inc.*, 898 F. Supp. 2d 171 (D.D.C. 2012) (granting petition for enforcement of administrative subpoena *duces tecum* issued to aid investigation of alleged unfair trade practices by drug manufacturer and its competitor); *United States v. Inst. for College Access & Success*, 27 F. Supp. 3d 106 (D.D.C. 2014) (granting petition to enforce administrative subpoena); *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121 (D.D.C. 2012) (granting petition to enforce administrative subpoena); *Anomnachi v. Social Security Admin., Office of Inspector Gen.*, 290 F. Supp. 3d 30 (D.D.C. 2017) (denying motion to quash administrative subpoena issued by Social Security Administration's Office of the Inspector General as part of fraud investigation of bank account); and *Nicksolat v. U.S. Dept. of Transp.*, 277 F. Supp. 3d 122 (D.D.C. 2017) (denying motion to quash administrative subpoena).

conclusion, the court relied on the fact that the Commission had received multiple complaints from individuals located outside of respondent's home state, the Commission had subpoenaed records from outside of that state, and the Commission's investigation had identified inter-state bank transactions originating from a number of different states.  *Id.* At 5-6.  The facts in this case are quite similar.

Because the Commission's activities in this nationwide investigation have been conducted almost exclusively in the District of Columbia, the District of Columbia bears "a sufficiently 'reasonable relation to the subject matter of the investigation' to qualify as a place" where the investigation was conducted under 7 U.S.C. § 9(8), in satisfaction of the first prong under *La Rouche*.  *La Rouche*, 613 F.2d at 856-57.

### C.     The Commission Reasonably Chose to File Its Application in the District of Columbia

In light of the Commission's location, headquartered in the District of Columbia, and the necessarily nationwide scope of its investigation, the Commission's choice of this jurisdiction as the place of its inquiry and for the enforcement of the Subpoena was well within "the bound of reasonableness" as required by the second *La Rouche* prong.  *La Rouche*, 613 F.2d at 857. *La Rouche* made clear that "the bound of reasonableness is broad indeed" and "an agency should be given ***substantial*** leeway in selecting its place of inquiry for subpoena enforcement purposes."  *Id.* at 855 (emphasis added).[10]  Here, as the Commission issued the Subpoena to Mr.

---

[10]   This is especially the case as the Commission has no regional office in Idaho.  *See* Ex. 3, *Conley,* No. 16-mc-02158, Dkt. No. 9, at 6 ("Given that the Commission is conducting an essentially nationwide investigation from its national office in the District of Columbia it is afforded broad discretion in selecting this jurisdiction as its place of inquiry, and thus it cannot be said that the Commission exceeded the bound of reasonableness in bringing this enforcement action in the District of Columbia.  That is especially the case because the Commission is headquartered in the District of Columbia and has no regional office in Florida [where respondent resides]." (citations omitted)).

Wilson from the Commission's headquarters in Washington, D.C., the Subpoena was returnable there, and Mr. Wilson produced documents to Division staff based in Washington, D.C., Mr. Wilson could reasonably believe that he would be subject to the jurisdiction of the federal court in the District of Columbia.

Nor is Mr. Wilson able to demonstrate any hardship associated with litigating this action in the District of Columbia.  As one court explained, the fact that the respondent and the vast majority of relevant documents are located in another jurisdiction:

> [H]as little bearing on this [subpoena enforcement] proceeding. The issue to be addressed in the show cause hearing is whether the subpoena shall be enforced. There is no need for the respondent to produce documents or witnesses at the hearing itself. Nor does the respondent have to appear in person at the hearing, as long as he is represented by counsel.

*Resolution Trust Corp. v. McDougal*, 158 F.R.D. 1, 1 (D.D.C. 1994).  *See also Ekasala*, 62 F. Supp. 3d at 95-96 (denying motion to change venue, and rejecting Florida-based individual's argument that litigating a subpoena enforcement action in the District of Columbia was a hardship).  Because Mr. Wilson is unable to "demonstrate [the] actual hardship of defending [him]self in the District of Columbia, . . . it is not difficult to conclude that the Commission's choice of the District of Columbia to enforce the subpoena is well-within the 'bound of reasonableness.'"  *ASAT*, 411 F.3d at 250 (quoting *La Rouche*, 613 F.2d at 857).

## II.        THIS COURT HAS PERSONAL JURISDICTION OVER MR. WILSON

Under Federal Rule of Civil Procedure 4(k)(1)(c), "[s]erving a summons . . . establishes personal jurisdiction over a defendant  . . . when authorized by federal statute." Fed. R. Civ. P. 4(k)(1)(c).  The D.C. Circuit has long held that statutes like 7 U.S.C. § 9(8) create an "implied grant of authority for extra-territorial service of process," *Browning*, 435 F.2d at 100 (D.C. Cir. 1970), and courts in this circuit have consistently held that extra-territorial service affords a court with personal jurisdiction over the respondent.  *See ASAT*, 411 F.3d at 251-52;

*see also La Rouche*, 613 F.2d at 860 ("It is inconceivable to us that Congress would have vested the Commission with such broad powers of compulsory process, while intending that they not have extraterritorial effect."); Ex. 3, *Conley,* No. 16-mc-02158, Dkt. No. 9, at 7 (holding that the language of Section 9(8) "must be interpreted as a special grant of jurisdiction" and thus authorizes the court "to obtain jurisdiction of the person [ ] of the defendant [ ] through service upon [him] of its process in whatever district [he] may be found.'" (quoting *Browning*, 435 F.2d at 99)); Ex. 2, *Sullivan,* No. 15-mc-00032, Dkt. No. 8, at 2 (holding that 7 U.S.C. § 9(8) "establishes where . . . personal jurisdiction [is] proper").  Because the Commission validly served Mr. Wilson with the Subpoena, this Court will obtain personal jurisdiction over Mr. Wilson once he is served with the Commission's application and accompanying papers, including any order to show cause issued by the Court.  *See* Ex. 3, *Conley*, No. 16-mc-02158. Dkt. No. 9, at 7 (holding that personal jurisdiction was proper because Conley "was served with the Commission's subpoena and subsequently served with this Court's order directing him to show cause").

## III.      VENUE IN THIS COURT IS PROPER

7 U.S.C. § 9(8) likewise provides for venue in this District.  Although questions of subject matter jurisdiction and proper venue are typically distinct, under the controlling statutory language "the two inquiries merge."  *ASAT*, 411 F.3d at 248.  *See also id.* ("Because the second [*La Rouche*] criterion resembles a traditional venue analysis that focuses on the convenience of the forum to the parties, . . . [it] implicates whether that court is a proper venue." (citations omitted)); *see also* Ex. 3, *Conley,* No. 16-mc-02158, Dkt. No. 9, at 3 (stating that the second *La Rouche* criteria implicates venue).  For the same reasons that it was within the "bounds of reasonableness" for the Commission to initiate this action in the District of Columbia, *see supra* Section I.C, venue is proper here.

## THE SUBPOENA IS VALID AND MUST BE ENFORCED

Administrative agencies like the Commission "wield broad power to gather information through the issuance of subpoenas," *Resolution Trust Corp. v. Grant Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994), and "[a]n administrative subpoena must be enforced if the information sought 'is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'" *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)); *accord Resolution Trust Corp. v. Frates*, 61 F.3d 962, 964 (D.C. Cir. 1995); *CFTC v. Ekasala*, 62 F. Supp. 3d 88, 93 (D.D.C. 2014); *United States v. Capitol Supply, Inc.*, 27 F. Supp. 3d 91, 99 (D.D.C. 2014).  Here, the Subpoena should be enforced because it seeks information that is within the Commission's authority and because the Subpoena otherwise complies with this Circuit's standard for enforcement.

## I.   THE SUBPOENA IS WITHIN THE COMMISSION'S BROAD INVESTIGATIVE AUTHORITY

The Commission, like other federal agencies, has far-reaching investigatory authority permitting it to "investigate merely on suspicion that the law is being violated, or even just because [the agency] wants assurance that it is not." *Morton Salt*, 338 U.S. at 642-43; *see also Walde*, 18 F.3d at 947 (following *Morton Salt*).  The Commission's authority is especially broad at the pre-complaint stage, where it "is under no obligation to propound a narrowly focused theory of a possible future case." *Ekasala*, 62 F. Supp. 3d at 93 (quoting *Federal Trade Comm. v. Texaco*, 555 F.2d 862, 872 (D.C. Cir. 1977)).

An essential component of this investigatory power is the Commission's ability to issue and serve subpoenas.  *See* 7 U.S.C. § 12(a)(1) ("For the efficient execution of the provisions of this Act . . . the Commission may make such investigations as it deems necessary to ascertain the facts regarding the operations . . . [of] persons subject to the provisions of this Act.") *and*

7 U.S.C. § 9(5) ("[A]ny . . . officer designated by the Commission . . . may . . . subpoena

witnesses, compel their attendance, take evidence, and require the production of any . . . records

that the Commission deems relevant or material to the inquiry"); *see also CFTC v. Harker*, 615

F. Supp. 420, 424 (D.D.C. 1985) ("[T]he Act grants the Commission the authority to subpoena

witnesses and to seek judicial enforcement of such subpoenas." (citing 7 U.S.C. § [9])).

Having followed proper administrative procedure, "[t]he CFTC must be given substantial

leeway to investigate" so that it may assess whether parties have "complied with or run afoul of

the [Act] or CFTC Regulations." *Collins v. CFTC*, 737 F. Supp. 1467, 1485 (N.D. Ill. 1990).

"[E]nforcement of [an agency's] investigatory subpoena will be denied only when there is 'a

patent lack of jurisdiction' in an agency to regulate or to investigate." *Federal Trade Comm. v.

Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001), *cert. denied*, 537 U.S. 820 (2002) (*quoting

Civil Aeronautics Bd. v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 952 (D.C. Cir.

1979)); *see also Texaco*, 555 F.2d at 872 ("T]he scope of issues which may be litigated in an

enforcement proceeding must be narrow, because of the important government interest in the

expeditious investigation of possible unlawful activity."); *Capitol Supply*, 27 F. Supp. 3d at 99

(citing *Texaco*).

The Subpoena to Mr. Wilson—properly issued pursuant to a formal order of

investigation—plainly falls within the scope of the Commission's authority to investigate

potential violations of the Act and Regulations.  *See* 7 U.S.C. §§ 9, 12(a)(1) (2012).  The

Subpoena seeks documents and information relating to a potentially fraudulent scheme involving

soliciting money for the purported purpose of trading forex and binary option products on behalf

of customers located in the United States.  This type of conduct falls within the Commission's

regulatory authority.  *See, e.g.*, 7 U.S.C. § 2(c)(2)(C)(iv) (2012); 17 C.F.R. § 5.2(b) (prohibiting

fraud in connection with certain foreign exchange transactions); 7 U.S.C. § 6b (2012); 17 C.F.R. § 180.1 (2016); *see also CFTC v. Trade Exchange Network Ltd.*, 117 F.Supp.3d 29, 35-38 (D.D.C. 2015) (holding that binary options in commodities are financial instruments regulated by the Commission under the Act); *CFTC v. Atkinson,* No. 18-23992-CIV, 2019 WL 2125026, at *1 (S.D. Fla. Feb. 4, 2019) (rejecting argument that binary options are outside of the Commission's jurisdiction); *CFTC v. Vision Financial Partners, et al.*, 190 F.Supp.3d 1126, 1130 (S.D. Fla. 2016) (same); *CFTC v. Banc de Binary Ltd.*, No. 2:13-cv-00992, 2016 WL 782927, at *7 (D. Nev. Feb. 29, 2016) (binary options were commodity options under the Act).  Documents and testimony responsive to the Subpoena would assist the Commission with determining whether there are or have been violations of these provisions.

## II.  THE SUBPOENA SEEKS SPECIFIC, RELEVANT INFORMATION

The standard for determining the relevance of records and testimony requested by an administrative subpoena "'is more relaxed than in an adjudicatory one . . . . The requested material, therefore, need only relevant to the investigation—the boundary of which may be defined quite generally.'"  *Walde*, 18 F.3d at 947 (*quoting Federal Trade Comm. v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir. 1992), *cert. denied*, 507 U.S. 910 (1993)); *accord Ekasala*, 62 F. Supp. 3d at 93.  In making a relevancy determination, a court must accept a federal "agency's own appraisal of relevancy . . . so long as it is not 'obviously wrong.'" *Invention Submission*, 965 F.2d at 1089 (quoting *Federal Trade Comm. v. Carter*, 636 F.2d 781, 787-88 (D.C. Cir. 1980)); *accord Ekasala*, 62 F. Supp. 3d at 93.  In the event of a challenge to a subpoena, "the party resisting an administrative subpoena bears the burden of showing that the information sought is irrelevant."  *Frates*, 61 F.3d at 964.

Here, Mr. Wilson provided no basis for his refusal to comply with the Subpoena, and he has not contested that he has no relevant documents or information.  Indeed, during a telephone

call with Division staff on April 8, 2019, Mr. Wilson acknowledged that he was in possession,

custody, or control of relevant documents that he had not produced.  Inv. Decl. at ¶ 19.  In any

event, a belated claim of irrelevancy would certainly fail.  The Subpoena seeks information that

is clearly relevant to the Commission's investigation into potential violations by Mr. Wilson and

the Cody Wilson Entities, including Simple Wealth.  Thus, for example, documents concerning

business enterprises that Mr. Wilson participated in or formed, Inv. Decl. at ¶ 14 and Ex. B

thereto at 5-7 (Demand Nos. 1-4), and concerning Mr. Wilson's trading accounts, statements, or

practices, *id.* (Demand Nos. 2, 12, 19), will allow the Commission to assess the scope and nature

of relevant trading involved.  Documents evidencing a complete list of Mr. Wilson's customers

will aid the Commission in identifying the full scope of his business as well as aid the

Commission in developing an approximate amount of money that Mr. Wilson collected or

returned to customers.  *Id.* (Demand No. 14).  Documents concerning Mr. Wilson's

communications with customers and prospective customers of the Cody Wilson Companies,

including Simple Wealth, *id.* (Demand Nos. 9, 12-13, 15-17), will provide leads as to who else

invested with Mr. Wilson and the related companies; likewise, documents regarding aliases,

email addresses, phone numbers, social media accounts, and messaging apps used by Mr.

Wilson, *id.* (Demand Nos. 5-8, 10), will provide leads as to how Mr. Wilson communicated with

customers and what other sources of relevant information might exist.  Documents concerning

Mr. Wilson's bank accounts, trading accounts, and assets, *id.* (Demand Nos. 11-12, 18-19), will

shed light on not only who may have provided funds for investment to Mr. Wilson but also

whether Mr. Wilson misappropriated customer funds.

　　　　Similarly, testimony from Mr. Wilson on these and other related topics will be

instrumental to the Commission's understanding of the nature, scope, and extent of the relevant

activities, and to further aid in its investigation.  Measured, as they must be, "'only against the general purposes of [the] investigation,'" such requests and demands for testimony indisputably are "reasonably" relevant to the Commission's investigation.  *Ekasala*, 62 F. Supp. 3d at 93 (quoting *Texaco*, 555 F.2d at 874) (finding requests for "corporate formation documents, promotional materials, information regarding former officers and employees, and bank account statements" to "plausibly contain information relevant to the investigation").

Finally, the Subpoena is narrowly focused, limited in time, and imposes minimal burdens on Mr. Wilson.  The Subpoena provides dates, definitions, instructions, and twenty specific requests for documents, limited to the period of September 1, 2014 through the November 2018. Inv. Decl. at ¶ 14 and Ex. B thereto.  Such requests are reasonable and should be enforced.  *See Ekasala*, 62 F. Supp. 3d at 93 (enforcing a subpoena with similarly definite requests); *see also Texaco*, 555 F.2d at 882 ("We emphasize that the question is whether the demand is unduly burdensome or unreasonably broad.  Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest.").  To the extent Mr. Wilson attempts to argue burden, this Court should deny such argument on the grounds that he "has not been responsive or particularly communicative with the CFTC regarding compliance . . . [and] he never made an attempt to comply with them in the first instance."  *See Ekasala*, 62 F. Supp. 3d at 95.

## CONCLUSION

The Court has subject matter jurisdiction over this action and personal jurisdiction over Mr. Wilson, and venue in this Court is proper.  The Subpoena, and the documents and information that it seeks, are well within the Commission's authority, and they are sufficiently definite and seek reasonably relevant information.  Therefore, the Court should issue an order requiring Mr. Wilson to show cause why he should not be compelled to comply fully with the

Subpoena.  Further, should Mr. Wilson not show good cause, then the Court should issue a

subsequent order:  (1) requiring Mr. Wilson to comply immediately in all respects with the

Subpoena, including by:  (a) producing to the Commission all documents specified in Schedule

A to the Subpoena that are in his possession, custody, or control; and (b) personally appearing

before the Commission at its headquarters in Washington, D.C. to provide testimony; and (2)

granting the Commission any other relief the Court deems appropriate.


Dated:  November 6, 2019                    Respectfully submitted,


                                            James H. Holl, III
                                            Chief Trial Attorney
                                            D.C. Bar No. 435473
                                            jholl@cftc.gov
                                            Tel:  (202) 418-5311

                                            Brian A. Hunt
                                            Trial Attorney
                                            Admitted pursuant to D.D.C. LCvR 83.2(e)
                                            bhunt@cftc.gov
                                            Tel:  (202) 418-5095

                                            COMMODITY FUTURES TRADING COMMISSION
                                            Three Lafayette Centre
                                            1155 21st Street NW
                                            Washington, D.C. 20581